Stuart *v.* Stuart *et al.*

*(Patton, Judge, Absent.)

Decided November 26, 1881.

18　675
f48　213

1. A devise to the *heirs* of a living person to take effect *immediately* is to be interpreted as a devise to the heirs apparent, the word heirs in such case being interpreted to be a *designatio personum* and not to have its usual and technical meaning, as the clear meaning of the will, that the devise should take effect *immediately*, would otherwise be defeated, as *nemo est heres viventis.*

---

*Submitted before Judge Patton took his seat

2. The rule construing the word *heirs* used in a will in respect to living persons as merely *designatio personum* is inapplicable to a devise of a future estate, such construction not being necessary in order to give effect to any clearly expressed intention of the testator.    In such case the word *heirs* has its strict leg¹l meaning and means the parties, who would on the death of the *propositus* inherit his real estate; and they take the real estate devised in the same proportions, as such persons would as heirs.

3. The word *family* has two very distinct meanings: 1st, The collective body of persons, who live in one house and under one head or manager; and it may include in this sense parents, children, servants, or in some cases even boarders or lodgers; 2d, Those who descend from one common progenitor; and in this sense it cannot include the parents and has no reference to the fact of residence in one house and under one head.

4. When used in its first sense, it rarely includes boarders̓ and lodgers: sometimes includes servants; generally includes children; but is sometimes confined to the wife and infant children or those dependent on the head of the family by reason of their relations independent of contract. The word has this comprehensive, or more or less limited, sense, as will most effectually carry out the purpose of the document, in which it is used.

5. In a will, where the word family is used as a designation of beneficiaries it excludes the parents and is generally confined to children, unless the apparent meaning of the testator as sʰown by the context is different and more comprehensive or more restricted.

6. A testatrix by her will leaves to trustees for the use of her son's wife and his family certain real estate, and, when her son ceases to have a family, to his *heirs* forever. The true construction of this will is, that the real estate is devised to the trustees for the use of the wife and children of the testatrix's son, who were living at the time of the testatrix's death, as joint tenants in fee simple but subject to a duty on the part of the trustees to apply or permit to be applied the rents, issues and profits of such real estate to the support and maintenance of such wife and children as a family, excluding therefrom such child as may not be residing at the father's home; but such application of the rents and profits of such real estate is to cease, when the wife dies, when all the daughters have married or attained the age of twenty-one, and when all the sons have attained the age of twenty-one, as at that time the family within the meaning of the will will have ceased to exist; and such rents, issues and profits can not longer be so applied, though the family in its most comprehensive sense continues to exist, the father and married daughters or adult sons continuing to live at the homestead. Upon the death of the testatrix's son, the father, this real estate must go as a springing devise to such persons as would be heirs to any real estate he might have owned, and in the same proportion, and of course amongst them would be included any children he might have by a second wife, who might be living at his death. The son of the testatrix, if his wife dies before the youngest child attains his majority, is not entitled to any curtesy in his wife's interest in this land, as she never was seized in fact

of this land during the marriage, it being during her lifetime in the hands of trustees, whose duty it was to appropriate the rents and profits to the support and maintenance of the family as a whole or unit.

Appeal from and *supersedeas* to two decrees of the circuit court of the county of Greenbrier, rendered respectively on the 15th day of November, 1876, and on the 24th day of May, 1879, in a cause then pending in said court, wherein William R. Stuart was plaintiff, and William R. Stuart, Sr., and others were defendants, allowed upon the petition of William R. Stuart, Sr.

Hon. Homer A. Holt, judge of the eighth judicial circuit, rendered the decrees appealed from.

GREEN, JUDGE, furnishes the following statement of the case:

William R. Stuart, Jr., in February, 1876, filed his bill in chancery in the circuit court of Greenbrier county against Thomas A. Bradford and Henry Stuart, trustees, Simon B. Williams, his father William R. Stuart, his brothers Charles A. Stuart, Augustus B. Stuart, I. Henry Stuart and Thomas F. Stuart and H. Augusta Bowen and Elizabeth Jennie Sehon and their husbands Thomas P. Bowen and Edward Sehon. The object of the bill was to obtain a construction of the second clause of the will of his grandmother, Elizabeth Stuart, and for a partition of the real estate named in the second clause of this will, and to require his father and brother Augustus B. Stuart to account for rents and profits of the land, since his father ceased to have a family. This second clause of this will is as follows:

"I will to Henry Stuart and Thomas Bradford in trust for my son Robinson Stuart's wife and his family the tract of land on which my said son now resides. Also the tract of land called the Henning place, and when Robinson ceases to have a family to his heirs forever—one third of my Raleigh lands, and the land on the Nicholas road to be held in trust by the said trustees for the same purpose and in the same way. Also the stock, farming utensils, household furniture, &c., to go with the lands—I mean such stock, &c., as may be there at my death. My slaves—Laura to be held and go in

the same way, if my son John claims Maria, who belongs to him, but if he does not claim Maria, she is to go in that way, and John is to have Louisa; and Leroy, George and Andy to be held and go in trust in the same way as the land and other property, with all the increase."

By the fourth clause of this will two slaves are given to Augusta, the daughter of William R. Stuart, Sr., called in the will Robinson Stuart, and another slave is given to his daughter, Elizabeth Jane, and all his other property, real and personal, except that named in this second clause, is given to the testatrix's son, John Stuart, and her daughter, Elizabeth Reid, and her husband, William B. Reid. The surrounding circumstances regarded by the parties as of importance in the interpretation of this second clause in the will are, that the will was executed March 15, 1859, and the testatrix died very shortly thereafter, her will being proven July, 1859. The place on which her son, William R. Stuart, Sr., lived, referred to in this second clause of the will, was worth about $28,000.00, the Henning place from $1,000.00 to $1,200.00, and the Nicholas lands were worth about $1,400.00. The annual value of these lands was about $1,200.00. When the will was written, and the testatrix died, her son, William R. Stuart, Sr., had two daughters and five sons, the oldest of whom was over twenty-one years old, and the youngest was some four years old. He had no other children; and his wife the mother of these children died some five years afterwards, in 1864. They all continued to live together till after her death on this homestead. In 1866, one of the daughters married and has never since lived at home. The other daughter married in 1870 and then finally left the homestead. The sons at different times having grown up left their home permanently, so that when this suit was instituted, there were residing at the homestead only Augustus B. Stuart, aged some thirty-three years, and the youngest son, Thomas F. Stuart, aged about nineteen years and six months, who was then at school temporarily absent from home. Augustus B. Stuart had married and his wife and child and her father, the defendant S. B. Williams, were also living at the homestead, and also his father, William R. Stuart, Sr. The agreement, which William R. Stuart signed, when S. B. Williams came there to live, November 15, 1873,

stipulated, that Stuart should furnish the corn used for bread in the family, a certain quantity of pork and the milk used, the garden and the furniture; and he required Williams to furnish the groceries and other things. He required Williams to furnish board for Augustus B. Stuart, his son, who was the son-in-law of Williams, and also to furnish board for any other member of his, William R. Stuart's family, as well as board for himself, and it was to be distinctly understood, that "William R. Stuart, Sr., was to have control and be the head of the family."

There is much contrariety in the evidence as to who was the head of the family after Williams and his wife came there to live in 1873. Some testified, that Williams was the head of the family, and others, that William R. Stuart, Sr., was the head of the family.

These being the substantial facts, the court rendered a decree on November 16, 1876, interpreting this will as follows.

"The process having been duly executed upon all the defendants, and this cause having been regularly set for hearing at rules upon the bill taken for confessed as to all the defendants, the defendant, William R. Stuart, Sr., and the infant defendant, Thomas F. Stuart, by his guardian *ad litem*, having filed their respective answers, to which the plaintiff replied generally, came on this day to be heard upon the bill, exhibits, the answers of William R. Stuart, Sr., and the infant, Thomas F. Stuart, as aforesaid, replication thereto, the bill taken for confessed as to all the other defendants, the depositions and affidavits of witnesses, which by consent are all treated as depositions duly taken upon notice, and arguments of counsel. On consideration whereof, the court is of opinion that the *second clause* of the will of Elizabeth Stuart exhibited with the plaintiff's bill must be construed as though it read as follows: " I will to Henry Stuart and Thomas Bradford, in trust for my son Robinson Stuart's wife and his (*children as a*) family the tract of land on which my said son now resides; also the tract of land called the Henning Place (*to hold for their support so long as they continue members of said family*), and when Robinson ceases (*by death or otherwise*) to have a family (*then*) to his heirs (*actual or apparent*) forever ; one third of my Raleigh lands and the lands on the Nicholas road to be held in

trust by said trustees for the same purpose and to go in the same way ; also the stock, farming utensils, household furniture, &c., to go with the lands—I mean such stock, &c., as there may be there at my death. My slave Louisa to be held and go in the same way, if my son John claims Maria, who belongs to him, but if he does not claim Maria, she is to go in the same way, and John is to have Louisa and Leroy, and Andy to be held and to go in trust in the same way as the land and other property with all the increase.' And the court therefore decides, that all the aforesaid property, both real and personal, is to be held in trust for the support of the said wife and the children of said Robinson Stuart so long as she lived or they continued members of his family, and when the said Robinson dies, or the youngest one of said children becomes twenty-one years of age, the said wife being dead, then said property vests absolutely in the children of said Robinson Stuart. And it appearing from the pleadings in this cause, that the defendant Thomas F. Stuart is not quite twenty-one years of age, it is ordered, that this cause be continued until said defendant becomes twenty-one years of age, and then, upon proof of that fact by the plaintiff, the court will grant him relief in accordance with the decisions hereinbefore made, if asked to do so."

On May 26, 1879, the court rendered the following decree : " This cause came on this day to be again heard upon the papers formerly read, the agreement of facts filed showing, that Thomas F. Stuart became twenty-one years of age on the 26th day of August, 1877, and upon argument of counsel. On consideration whereof, and on motion of the plaintiff, it is ordered, that Harvey Handley, J. F. Watts and Jesse Bright, who are hereby appointed commissioners for the purpose, do go upon the lands in the bill mentioned as having been devised to Robinson Stuart's wife and family, (except the Raleigh lands), and lay off and assign to the plaintiff the one seventh part thereof in value, having a due regard to the quantity and quality of the land thus assigned and to the residue, and that they report to this court at its present term, if possible, giving in their report the metes and bounds of the land assigned to the plaintiff, and that they report any other matter deemed pertinent by themselves or required to be specially stated by any party in interest."

From these decrees an appeal and ·*supersedeas* has been allowed to William R. Stuart, Sr.

*Dennis & Dennis* for appellant cited : Wigram on Wills 29, 30; and Hawkins on Wills 1.

*John W. .English* for appellees :

In construing a will the cardinal rule is to seek the real intention of the testator, which is to be derived from the context and from the whole paper. (2 Min. Inst. 948; Redfield on the Law of Wills 433.

" The construction should be reasonable and agreeable to common understanding."

" Where the intention is clear, too minute a stress is not to be laid on the strict signification of words," &c. (2 Min. Inst, 948.)

The word family, *prima facie* means children, and such construction ought to be adhered to unless some reason be found in the context of the will for· extending or altering it. (See *Wheelan et al.* v. *Reilly et al.*, 3 W. Va. 610.

Children cease to be a portion of their father's family when they attain their majority, and have no legal right to call on him for support.

" An unmarried man who has no children or other person *dependent on him* living with him, though he keeps house and has persons hired by him living with him is not a householder or head of a family." (See *Calham* v. *Williams*, 32 Gratt. 18.

He upon whom the law imposes the duty to support, growing out of the status is made the test. (*Same case.*).

If the word heirs is not used in its technical sense, but inaccurately and merely as *descriptio personœ*, those who were at the time of the limitation heirs apparent or presumptive would take a vested remainder. (See 2 Min. Inst. 343; 3 Lom. Dig. (2d ed.) 236; *Id.* (3d ed.) 237.

GREEN, JUDGE, announced the opinion of the Court :

The only question in controversy in this cause is the true interprepation of the second clause of the will of Elizabeth Stuart. The difficulty in understanding this clause is the use of the words "heirs" and " his family," meaning the family

of William R. Stuart, Sr., by which in part are designated the beneficiaries under this second clause of this will, and the words used to designate, when these beneficiaries, whoever they may be, shall have the full enjoyment of the property named in this second clause, the time being designated as, " when Robinson (meaning William R. Stuart, Sr.,) ceases to have a family," at which time it is to go, says the will, " to his heirs forever."

. The word " family " has a great variety of meanings depending on the instrument, in which it is used. If it be in an act of the Legislature, its meaning varies with the varying purposes of the act, in which it is used. If it be in a contract, its meaning largely depends on the character of the contract. If in a will, it depends not only upon the context and purposes, for which it is used in the will, but in England also upon the nature of the property bequeathed or devised. So variant is the meaning of this word family, that in the same will the identical same words will be construed as having essentially different meanings.

In its broadest and most comprehensive sense a family is "a household including parents, children, servants and, as the case may be, lodgers and boarders ; the collective body of persons, who live in one house and under one head or management." This comprehensive meaning was given this word in the case of the *Chicago & Northwestern Railway Co.* v. *Chisholm,* 79 Ill. 587, where a ticket had been issued by the company " for the exclusive use of a certain man and his family." In this case it was held, that a son of such person, who resided with his father, though he was over twenty-one years of age, had a right to ride on the railroad cars on such a ticket issued to the father. The same comprehensive meaning was given the word family, when used in a statute in Illinois, which gave the widow such beds, bedsteads, bedding and household and kitchen-furniture as may be necessary for herself and family, and provisions for a year for herself and family. The court in *Strawn et al.* v. *Strawn,* 53 Ill. 274, in speaking of this statute say : " We are of opinion the legislature intended by the word family to include such persons, as constituted the family of the deceased at the time of his death, whether servants or children, who had attained their

majority. In this of course we do not include boarders, but only the persons constituting the private household of the deceased."

But a less comprehensive meaning was given to the word "family" as used in a similar Missouri statute. The court in speaking of this statute says in *Whaley* v *Whaley et al.*, 50 Mo. 581, 582 : "Family, as here contemplated, means children or those persons, who have a legal and moral right to expect to be fed and clothed by another, but those persons, who have neither a legal nor moral claim to the bounty of another, cannot be placed in that category." The court accordingly held, that within the meaning of this statute, which gave the widow the provisions "necessary for the subsistence of her family for twelve months," were not to be included provisions for servants. They say in its limited sense the word family means "the father, mother and children."

In *Wilson* v. *Cochran*, 31 Tex. 677, the most sweeping and comprehensive meaning was given to the word family in the Constitution of Texas, which protects from forced sales the homestead of a family. Speaking of this provision of their Constitution the court say, page 680 : "The word family was most certainly used in its generic sense, embracing a household composed of parents and children or other relatives, or domestics and servants; in short every collective body of persons living together within the curtilage, subsisting in common, directing their attention to a common object, the promotion of their mutual interest and social happiness." * * * "And if the property, on which they are domiciled, belongs to either or to all so living together, it equally comes within the purview of the constitutional guaranty, and in fact is a homestead, and cannot be subjected to a forced sale."

A much more restricted meaning is given to the word family as used in the Constitution of Virginia giving a homestead to the head of a family. In defining the meaning of this word as so used the court in *Calhoun* v. *Williams*, 32 Gratt. 22, say : "The family may consist of a wife and children or of other persons, who may stand in a state of dependence in the family relation; or it may consist of persons standing in either of these relations to the head of the family, whether the father or mother or a brother or sister or other

relation is the head; but they must be persons, who are dependent in some measure on the head for support, and who have an interest in his holding his property, and would be prejudiced by its seizure and sale under execution or other process, and who would be benefitted by its exemption." Again they say, page 24: " There are cases, which hold, that to constitute a family within the meaning of such statutes there must be a condition of *dependence* and not a mere aggregation of individuals ;" and therefore " a single man, who has no other person living with him than servants and employes, is not the head of a family within the meaning of statutes creating homestead exemptions." This was the decision of the court in that case.

Thus the comprehensive meaning of the word "family" as given by the lexicographers : " The collective body of persons who live in one house and under one head or manager," has been variously modified by the courts to suit the general views of those, by whom the word is used; and it is rarely interpreted to have as comprehensive a meaning, as the definition given by the lexicographers. But there is another and quite distinct meaning given by all lexicographers to this word " family," a meaning which is often in common parlance attached to this word. That meaning is: " Those who descend from one common progenitor—a tribe or race." This second meaning qualified to suit the particular occasion of its use, as the first meaning was, is the one attached to this word " family" almost always by the courts, when it is used in a will to designate the beneficiaries in a will. When this second meaning is given to the word, it is of course utterly unimportant, whether the parties designated by the word "family" "live in one house" or not, or whether they are " under one head or manager" or not. Often those, who live in one house or under one head or manager, are held not to be included in the meaning of the word "family." What is required is, that " they descend from one common progenitor." Thus it is universally held by the courts, that if a legacy be given to " A.'s family," A. having children, the father, A., is not included in the word family and is entitled to no part of the legacy. Nor is the wife of A. ever held to be included in this word family in such case ; but the word is in such case,

when not controlled by other expressions in the will, always interpreted to mean A.'s children to the exclusion of both A. and his wife. See *Barnes* v. *Patch*, 8 Ves. 604–607; *Mc-Leorath* v. *Bacon*, 5 Ves. 166; *Woods* v. *Woods*, 1 Myl. & Cr. 401; *White* v. *Briggs*, 23 Eng. Chy. R. 583; *Wood* v. *Wood*, 25 Eng. Chy. R. 64; *Parkinson, Trust*, 40 Eng. Chy. R. 242; *Gregory* v. *Smith*, 41 Eng. Chy. 708.

These cases show conclusively, that if by a will a bequest be made to A's wife and his family, and there be no words in the will to control or modify their meaning, the wife and children would be entitled to the legacy as joint tenants. In England if lands be devised to "A's family," and he has several children, the land under such a will passes to the eldest son of A or to his heir. See *Chapman's Case*, Dy. 333; *Camden* v. *Clarke*, Hub. 33; *Wright* v. *Atkyns*, Coop. 122; *Doe* v. *Smith*, 5 M. & S. 126. But, as the cases show, this construction is placed on a devise because of the right of primogeniture in England; and it is obvious, that here the construction of the word "family" would be the same in a devise as in a bequest. There have been cases in England, where under peculiar circumstances and provisions in a will the courts have set aside a bequest because of the vagueness and uncertainty of the meaning of the word "family" in its connection with other words used. See *Doe* v. *Fleming*, 2 Cromp. M. & R. 638; *Robinson* v. *Waddelow*, 8 Sim. 134.

But the authority of these and like cases has been questioned; and the cases we have cited and many more show, that in a will worded as the one, which we are construing, the word "family" has a certain meaning; and it would not be held, that the devise or bequest was void for uncertainty. See *Hill's ex'rs* v. *Bowman*, 7 Leigh 650, and *Whelan et al.* v. *Reiley*, 5 W. Va. 356. This Court in the last case decided, that the expression "family" in a will is held *prima facie* to mean children and must be so construed, unless some reason appears in the context of the will for extending or altering it. If therefore there had been no interposition of trustees in this will and nothing else in the will indicating a qualification of its meaning, the devise and bequest in the beginning of the second clause to Wm. R. Stuart's wife and his family must have been interpreted as a devise and bequest to his

wife and children living at the death of the testatrix as joint tenants, as the authorities we have cited abundantly show. The devise and bequest was to take effect immediately, and therefore of course those, who answered the description of the beneficiaries under the language used at the death of the testatrix, when the will took effect, and those only would be regarded as the beneficiaries meant by the will.

It remains to enquire, how far this meaning of the words used by the testatrix is modified by this property being willed to trustees for the use of those beneficiaries, and by the subsequent provision, that "when Robinson ceases to have a family, it was to go to his heirs forever. This language, considered in connection with the fact, that the property was devised and bequeathed to trustees, till the family ceased to exist, shows that the family itself as a family or unit was intended to have the use of this property, till it ceased to exist as a family ; and that during the continuance of the family as the family of Robinson, the father, the property was not to belong to the wife and children as joint tenants and liable to be divided among them. The difference thus produced is, that the children, who after they were educated and obtained their majority and ceased permanently to be members of the household, so long as the family continued to exist, would have no right to have the property divided, nor would they have any claim to any part of the rents and profits of the property during the continued existence of the family as such. The rents and profits were intended to be appropriated to the education and support of the members of the family, who remained at home, to the exclusion of married daughters, who had left home, or sons who had obtained their majorty and left their original home.

The apparent object of the testatrix in the modification was to put all the children of W. R. Stuart, her son, on an equality by allowing the rents and profits of the property, about $1,200.00 a year, to be applied to the support and education of the younger children while children instead of allowing it to be appropriated by elder children, who had already received their education, attained their majority, or been married, if females, and set up for themselves. The idea that the rents and profits of the land were to be appropriated for the sup-

port and maintenance of the family, till William R. Stuart ceased to have a family, was always acted upon by all the parties in trust; and it is not now controverted by the counsel of any of them; and I think, that it is a construction, which may be deduced fairly from that clause of the will, though the idea is certainly badly expressed.

The word "family" in the phrase "when Robinson ceases to have a family" obviously does not mean, as it did in the beginning of this clause of the will, children. Its meaning is not here the second meaning of this word : "those who descend from a common progenitor" without reference to their residence ; but its meaning is a qualification of the first meaning of this word: "a collective body of persons, who live in one house and under one head or manager." When this word "family" derives its meaning from this definition of it, the authorities we have cited show, that its meaning varies considerably. Thus in some cases it includes servants resident in the house or connected with the household ; and it may be in some cases it might include even boarders, as doubtless its comprehensive meaning would. But boarders are generally not included in this word "family"; and we have seen in some instances servants also are excluded from it. Children are often included in this meaning of the word family, when resident at home, though they have attained their majority. But in other cases children, who have attained the age of twenty-one, would not be included in this word family and it would be confined in its meaning to persons, whom the head of the family was under a legal obligation independent of contract to support. This was the interpretation of the word in *Calhoun* v. *Williams,* 32 Gratt. 18. This interpretation would include in the word family the wife and infant children, that is, children under twenty-one years of age, but would exclude from it children, who had attained their majority, though they might continue to reside with the father ; and so too, it would exclude a daughter under twenty-one years of age, who had married and continued to live at her father's house, as he would be under no obligation to support her, such obligation by her marriage being transferred to her husband.

Looking to the obvious purpose which the testatrix had in impliedly directing the rents and profits of the prpoerty to

be applied to the support of Wm. R. Stuart's family as such, we must conclude that she meant thereby only his wife and children. They only, as the will shows, were intended to be the beneficiaries under her will. It excluded Wm. R. Stuart or any son-in-law. It is true Wm. R. Stuart, as the head of the family, would necessarily receive an indirect benefit from the trustees applying the. rents and profits of the property to the support of his wife and children, as he would be thereby relieved from his legal obligation to support them; but it is obvious that he was not intended to have any benefit under this will directly or in any way except by the indirect and unavoidable relief he would get from supporting his wife and infant children, which would necessarily result from the testatrix aiding in their support, and which, it is obvious, she intended to do by her will.

When then did William R. Stuart cease to have a family within the meaning of this will? Obviously when his wife died, his daughters all married, and his youngest son attained the age of twenty-one; that is, on the facts shown in this cause on August 26, 1877. After that no one, who might be living with him, whether married daughter or adult son, was dependent upon him, and to permit the proceeds of all this property, designed obviously for the use of his wife and his children, some $1,200.00 a year, to be used in the support of a family composed, it might be, in no part of his wife or children, the sole beneficiaries, merely because in some sense he had not ceased to have a family, would clearly be wrong. He had ceased to have a family within the true meaning of this word, as used in this will; and it would, it seems to me, be equally a violation of the evident intention of the testatrix to permit all the profits of this property, $1,200.00 a year, to be thus indefinitely applied to the support of the family of William R. Stuart, Sr., when it consisted only of himself and his youngest son, who was a full-grown man over twenty-one years of age. It was the design of the testatrix to have the rents and profits of the property applied to the support of the family, that is, while the wife lived, and till every member of the family, that is every child, was reared and educated, till the youngest of them was twenty-one years old. If the family could be

construed as not then ceasing to exist, it might be continued indefinitely by the youngest son continuing to reside at home; and thus he and his father could appropriate indefinitely all the proceeds of the property to the entire exclusion of all the other children, after every reason, why he should enjoy the benefit of such proceeds beyond his brothers and sisters, had ceased.

The same objections lie to holding that the family could be continued in existence by a married daughter and her husband continuing to reside with the father, whether the father was the head of the family or not. It is a new and different family from that contemplated by the will. The family contemplated by the will was one composed in whole or in part of the wife, unmarried daughters, and infant sons or daughters; and whenever William R. Stuart's family ceased to be composed in any part of any of these persons, he ceased to have a family within the true meaning of this language as used in the will. By the words therefore " when Robinson ceases to have a family to his heirs forever " is meant, when his wife dies, and when his daughters marry, and when his youngest son attains the age of twenty-one. After that he ceased to have the family contemplated by this will.

But what is meant by the provision of the will, that this property is then to go " to his heirs "? It is contended, that this means " to his heirs apparent," that is, to his then children. But after a careful consideration of the question and of the whole will I am forced to give to the words " his heirs forever " the usual technical meaning of such words. And to conclude, that the meaning of the testatrix is, that on his death the property shall go to such persons and in such proportions, as real estate owned by him would descend to such persons, as at the death of William R. Stuart, Sr. answer the description of his heirs. The word heirs is a word of well known legal signification, and when used in a will it ought to be given this strict legal meaning, unless from the context it clearly appears, that it was used by the testator in a different sense. An instance, where the courts have given to the word, heirs, another meaning than its strict technical and well-known meaning, is where a testator by his will makes a *present* and *immediate* devise to the heirs of a

87

person known to be living; or where the devise is to heirs said in the will to be living. In such case it is apparent, that that the word, heirs, must mean heirs apparent or children, and that, without violating the clear intention of the testator it cannot be construed as used in its ordinary legal signification. See *James* v. *Richardson,* 1 Vent. 534; 7 Jones 97; 3 Neb. 832; Pol. 457; 2 Lev. 232; Raym. 330; 1 Eq. Cas. Abr. 214; *Burchet* v. *Dordant,* 2 Vent. 311; 1 P. Wms. 233; 5 B. & C. 148 (11 E. C. L. 145); *Goodright* v. *White,* Black. W. 1010; *Campbell* v. *Rawdon,* 18 N. Y. 416; *Conklin* v. *Conklin,* 3 Sanf. Chy. 70.

But this rule established by these authorities, whereby the word, heir, when used in respect to a living person means heir apparent, is inapplicable to the devise of a *future* estate. In such case the word, heir, has its strict legal meaning, unless a different intention appears clearly from the context. See *Campbell* v. *Rawdon,* 18 N. Y. 412; *Criswell's Appeal,* 5 Wright (41 Pa.) 288; *Richardson &c.* v. *Wheatland,* 7 Metc. 169; *Milhollen's adm'r* v. *Rice et al.,* 13 W. Va. 566; *Reid et al.* v. *Stuart* and *Ellett & Co.* v. *Reid et al.,* 13 W. Va. 338. In the last named case this Court reviewed all the above and other authorities and reached these conclusions. It was a case, in which was involved the construction of the word, heirs, used by the same testatrix in the codicil to this same will now before us for construction. After careful consideration we were compelled in that case to conclude, that the word, heirs, as used in the codicil of this will, meant heirs in its usual and legal signification; and for the reasons set forth in the opinion of the court in that case we are compelled to interpret this word, heirs, as having its usual and legal signification also in this second clause of this will. I cannot perceive, that such a construction violates any clear intention of the testatrix. I can see nothing in the will, that requires of us to say, that on the death of her son Robinson the testatrix meant, that all the property she had given should go to the children of his then wife in exclusion of his children by any other wife, if he should again marry. All such children would be equally related to the testatrix and to her son; and there is nothing in the will, which shows clearly, that she meant to exclude them. It is true, that the children of his first wife were the special

objects of her bounty; but this does not negative the view, that she might well desire to make some provision for children by a second wife. This she has done by saying, that on her son's death this property is to pass to his heirs, words which would include those children by a second marriage, and which we must give effect to according to their natural meaning.

Another question suggest itself: As the wife of William R. Stuart, Sr., had an equal interest in this property with her children severally, has not he as tenant by curtesy an interest in this real estate? I am of opinion, that he has not. One of the requisites to make a tenant by curtesy is, that the wife should have been seized in fact of the land; a seizure in law would not suffice. Now the legal title to this land on the death of the testatrix passed immediately by the will to the trustees; and, as we interpret the will, it was their duty to apply the proceeds of the land, the rents and profits, to the support of the family as a unit. William R. Stuart was never entitled to receive any portion of these rents and profits and never did, we suppose, receive any of them during the life of his wife. He certainly had no right to receive any portion of them. Neither he nor she had therefore during the marriage any actual seizure of this land; and therefore he is entitled to no curtesy in it. On the death of his wife it descended to her heirs, who were her children.

The conclusion therefore that we reach is, that by the true construction of the second clause of the will of Elizabeth Stuart the real estate named in said clause of this will was devised to Henry Stuart and Thomas Bradford in trust for the wife and children of William R. Stuart, Sr., who were living at the death of the testatrix, to be held by them as joint tenants, but subject to this provision, that the rents, issues and profits of the property were to be applied by the trustees or with the assent of the trustees to the support of such of them, as continued members of the family by residence with their father, such application to be made of the rents and profits during the lifetime of the wife, and till the youngest child arrived at the age of twenty-one and no longer, that thereafter being freed from this special charge it became the property of the children of William R. Stuart, Sr., as joint tenants, they having inherited the portion of it, which belonged to their moth-

er; that these children will remain such joint tenants, unless they choose to sever their tenantcy by a division of this property, till the death of their father, William R. Stuart, Sr., when the estate of these children in said property will terminate, and in lieu of it will arise a *springing* devise in favor of all persons, who would be heirs of William R. Stuart at his death, including these children and, if any of them be dead, their descendants, but including also any other children of William R. Stuart, Sr., whom he may have living at his death. Therefore any division now made of these lands among the children of William R. Stuart, Sr., will be subject to be revoked and rendered a nullity by his having other children born hereafter and living at his death. And while the parties entitled have elected to make a division of said real estate among themselves, which was directed to be done by the decree of January 26, 1879, yet as this election was made, when the court had held, that they had in the land an indefeasable estate of fee simple, and they may not choose to have such division, when it is liable on a certain event, should it happen, to be set aside, it is proper for this reason to set aside said decree of January 26, 1879.

The decrees of the circuit court were based on an interpretation of this second clause of this will, which accords substantially with the opinion above expressed, except that it holds, that on the death of William R. Stuart, Sr., any children he might hereafter have, and who might be living at his death, would have no interest in this property. This construction of the will is in this respect, I think, erroneous; and I am therefore of opinion, that the decrees of the circuit court of November 15, 1876, and of May 26, 1879, should be reversed and annulled, and that the appellant should recover of the appellees his costs in this court expended, and that this court should render a decree construing said will in the manner above indicated, and remand the cause to the circuit court to be further proceeded with pursuant to the principles laid down in this opinion and further according to the principles governing courts of equity.

THE OTHER JUDGES CONCURRED.

DECREES REVERSED, CAUSE REMANDED.